(C.D. 3875)

J. E. BERNARD & CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided August, 4, 1969)

*Schwartz & Lidstrom* (*Barnes, Richardson & Colburn* and *Joseph Schwartz* of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Bernard J. Babb* and *Robert Blanc*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This is an action for refund of customs duties which involves the question as to the proper tariff classification of certain integrators which were imported from West Germany by G.P.E. Controls, Inc. of Morton Grove, Illinois, between November 1964 and June 1965, and entered at Chicago by plaintiff as customs broker.

The imported integrators were classified by the government under item 713.15 of the Tariff Schedules of the United States (19 U.S.C. (1964 ed.) § 1202) as parts of gas and liquid supply or production meters and were assessed with duty at 45 percent ad valorem.

Plaintiff has protested this classification, claiming that the articles in question are not gas or liquid supply or production meters, nor parts thereof, and are not described in item 713.15, but rather are classifiable under item 712.50 as other electrical measuring, checking or automatically-controlling instruments and apparatus, dutiable at only 12 percent ad valorem.[1] We hold that plaintiff has failed to prove that the government's classification is incorrect and therefore overrule the protest.

Set out below are the relevant statutory provisions—which are contained in schedule 7, part 2, subpart D of the tariff schedules:

Subpart D headnotes:

\*      \*      \*      \*      \*      \*      \*

2. For the purposes of this subpart, the provisions herein (items 712.00 to 712.99, inclusive) for "electrical measuring, checking, analyzing, or automatically-controlling instruments and apparatus" apply only to the following articles:

(a) appliances, instruments, apparatus, or machines of kinds described in subpart C of this part or in the provisions of this subpart (subpart D) covered by items 711.00 to 711.99, inclusive (except magnetic speedometers), the operation of which depends on an electrical phenomenon which varies according to the factor to be ascertained or automatically controlled;

(b) instruments or apparatus for measuring or checking electrical quantities; \* \* \*

Classified under:

Gas and liquid supply or production meters; watt-hour meters, ampere-hour meters, and other electricity supply or production

---

[1] In its protest, plaintiff interposed an alternative claim under item 711.98 which provides, among other things, for "counters." That claim has been abandoned.

meters designed to register the total amount of electricity or electrical energy produced or consumed; standard meters for checking and calibrating any of the foregoing meters; all the foregoing and parts therefor:

Meters:

\*    \*    \*    \*    \*    \*    \*

713.15    Parts _____ 45% ad val

Claimed under:

Electrical measuring, checking, analyzing, or auto-matically-controlling instruments and apparatus, and parts thereof:

\* \* \*    Optical instruments or apparatus, and parts thereof _____    \* \* \*

Other:

\*    \*    \*    \*    \*    \*    \*

712.50    Other _____ 12% ad val.

We consider first the record which consists of the testimony of one witness, the chief engineer of G.P.E. Controls, who was called by plaintiff, and two illustrative exhibits. The testimony of this witness was to the following effect: G.P.E. is a manufacturer of instruments and controls for the "industrial control" industry which uses them to automate processes in such plant operations as open-hearth blast furnaces. In this connection the integrators in question are sold to companies which incorporate them into control systems that they in turn sell to industrial plants for process control.

In operation, the integrator receives an electrical input signal that is proportional to some other variable, which is anything that generates the electrical signal, but is generally a flow signal; the integrator then provides an output which is shown on a counter—which output is proportional to the integrated value of the electrical signal. Illustrative is the use of an integrator in a ratio control system for the firing of fuel in a furnace. In such a system, the integrator totalizes [2] or integrates [3] the fuel used for a particular batch operation of heating and is used to record the total amount of fuel (i.e., the total cubic feet of gas) consumed in the furnace over a period of time. This is important in showing whether too much or too little fuel is being consumed and whether too rich or too lean a mixture of fuel and air is being utilized in the operation.

---

[2] *Webster's International Dictionary of the English Language,* Second Edition, Unabridged (1948), at p. 2675, defines "totalize":
totalize \* \* \* v.t. \* \* \* To make total or a total; to combine into a whole. v.i. To register totals; esp., to use a totalizator.

[3] *Webster's, supra,* defines "integrate" and "integrator" at p. 1290:
integrate \* \* \* 3. To indicate the whole of; to give the sum or total of; as an *integrating* anemometer.

More particularly, in a typical ratio control system of this kind, the ratio of fuel to air is measured and controlled. This is done with flow meters which produce differential pressure signals proportional to flow. The flow signals thus produced are measured by flow transmitters which produce two other electrical signals proportionate to flow—one to fuel and one to air flow. Each of these signals is then sent to an electrical controller which produces an output proportional to the ratio of the two input signals; that output controls a valve in the fuel line to adjust the fuel so that fuel and air are held to an appropriate flow. A signal generated by the fuel transmitter also goes to the integrator which totalizes or integrates the fuel used in a batch operation of heating.

Additional aspects of the witness' testimony were as follows: He testified that he did not know what gas production meters, liquid supply meters or production meters were. Later he indicated that a meter is something that actually meters the rate of process flow and is primarily a measuring device. He expressed the opinion that the integrator is not a "meter" because that term is not definitive enough for the device in question; rather, he stated that the best name for the imported article is an "integrator," adding that the article, as imported, is a "complete working integrator." Further, in his opinion, the integrators in question are "electrical measuring instruments" because they measure the quantity of the variable electric input signal. In many instances, he stated, an integrator is also used as a checking instrument and, in addition, can be used as an automatic controlling instrument. He further testified that integrators are used for measuring or checking electrical quantities, and that their operation depends on an electrical phenomenon which varies according to the factor to be ascertained. He declared that there is no meter in an integrator and that its critical parts consist of a resistor network, integrating motor and counter.

On cross-examination the witness testified that the imported integrator cannot impart information without being connected to something else—such as a flow-senser and a flow-transmitter which measure the signal from the primary device and produce an output signal that provides an input signal to the integrator. Without the flow-transmitter the integrator is completely functionless. He reiterated that the integrator (in the example previously set out) expressed the amount of fuel used over a given period of time. Finally, he stated that the imported integrators are not parts of meters as they are complete instruments or entities in themselves.

In this setting, plaintiff's argument is that since the integrators "respond to electrical signals to provide a reading which is indicative of the totalized or integrated amount of [flow]," they are "instruments

for measuring electrical quantities" and "do not measure any liquid, gas or electricity as such." Defendant's position, in essence, is that since the admitted function of the integrator is to give the total measurement of gas or liquid used over a given period of time, it is a part of a meter within the meaning of item 713.15.

First, it is to be observed that the articles covered by item 713.15 were (as the parties agree) formerly classified under paragraph 368 of the Tariff Act of 1930—which paragraph covered, among other things, "any mechanism, device, or instrument intended or suitable for measuring * * * the flowage of water, gas, or electricity * * *." In this circumstance, several cases arising under paragraph 368 are helpful in determining the intended reach of item 713.15. One such case is *United States* v. *G.L. Electronics, Inc., et al.*, 49 CCPA 111, C.A.D. 804 (1962), where imported "Toho Testers" (referred to as meters throughout the decision) were classified by the government under paragraph 368 as instruments suitable for measuring "the flowage of electricity." Plaintiff-appellee claimed the articles were properly classifiable as articles having as an essential feature an electrical element or device under paragraph 353 because the so-called "meters" did not measure the flowage of electricity but merely gave information about a transient condition, i.e., the amperage passing through the meter at a given time. The court sustained this contention and made the following observations which are particularly pertinent here (49 CCPA at 116):

> * * * [T]he construction of paragraph 368 * * * excludes therefrom a meter or gauge which merely gives information about a transient condition such as pressure, voltage, or amperage, as distinguished from the kind of quantity-measuring meter in which information on through-put or "flowage" is accumulated * * *.

Similarly in *Universal Foreign Service, Inc., Gonset Division et al.* v. *United States*, 47 Cust. Ct. 183, C.D. 2300 (1961), the devices involved were held not to be classifiable under paragraph 368 of the 1930 act because they did not measure accumulated amounts of electrical flowage but only registered the transient electrical quantity or quality.

The explanatory notes to schedule 7 of the *Tariff Classification Study* (Nov. 15, 1960) provide further indication that item 713.15 is intended to cover articles which measure an accumulated quantity—as distinguished from articles which merely give "the rate of process flow" or information regarding a transient condition. Thus the explanatory notes state (pp. 157-58):

> Items 713.05 through 713.15 cover gas, liquid, and electricity supply or production meters. *These meters indicate total amount of liquid, gas, or electricity delivered over a particular time.* The provision in the superior heading for "standard meters for check-

ing or calibrating any of the foregoing meters" refers to meters which are meter standards against which the regular supply or production meters can be checked or calibrated and are not intended to include so-called standard instruments such as voltmeters, ohmmeters, etc. *The rates of duty reflected in these items are the currently effective rates in paragraph 368* except that the rate of 12.5 cents for each jewel has been dropped as being unimportant for this class of articles. [Emphasis added.]

Against this background, the integrators in question clearly fall within the category of "meters [which] indicate [the] total amount of * * * gas * * * delivered over a particular time." Thus plaintiff's witness testified (R. 21):

Q. Can you tell us in layman's language why people use integrators?—A. They use these electrical integrators in order to, many times, the total amount of fuel is important. In this case the total amount of fuel that you use to fire a furnace is important in order to study the operation and firing of the furnace, whether they are using too much, they are rich or they are lean on mixture is important to them, and as such they like to know what the total amount of fuel, total cubic feet of gas would be for a period of time. This is a way of indicating that.

An additional consideration worthy of mention is the testimony of plaintiff's witness that the imported integrator could not be referred to as a meter which he defined as follows (R. 32):

A meter in my definition, and the way that I have used it here, *has actually metered the rate of process flow.* It has been primarily a measuring device. [Emphasis added.]

But it is clear from what has been said that such a definition of "meter" is scarcely consonant with the meaning of that term as used in item 713.15, i.e., a device which indicates the total amount of liquid, gas or electricity delivered over a particular time.

We conclude, in short, that in the example presented by plaintiff, the integrator is used as a "meter." However, this does not end the matter inasmuch as the imported integrators were classified by the government not as "meters" but rather as "parts" of meters. The question, therefore, is whether such an integrator can also be used as a *part* of a meter. Very much in point on this issue is *John B. Hewett Co., Inc.* v. *United States,* 48 CCPA 24, C.A.D. 757 (1960), where the court held that so-called B.T.U. meters were properly classified under paragraph 368 of the 1930 act. Of particular importance is that one of the parts of the B.T.U. meter was "an integrating mechanism" which performed the same function in the B.T.U. meter as the imported integrator performs in the fuel system described by plaintiff's witness. The B.T.U. meter was described as follows (48 CCPA at 26):

\* \* \* *The b.t.u. meter consists of* a flow meter, *an integrating mechanism mounted on the liquid or flow meter,* and two temperature-sensitive bulbs filled with mercury which are inserted into the supply and return pipe or into the cold and hot water lines. *The integrator includes two six-digit counters, one of which indicates the total heat supplied in b.t.u.'s, the second counter records total gallons passed through the meter.* A pointer above the counter indicates the temperature differences in degrees Fahrenheit of the supply and return liquid.

In a hot water circulating system intended to heat a room, for example, water enters through a hot water supply line, passes through radiators, and leaves through a cold water return line. The cold water is then reheated and recirculated. The B.T.U. meter is installed in such a system. *The flow of water through the meter and the mercury in the two temperature-sensitive bulbs in the supply and return lines together actuate the integrating mechanism which in turn actuates the B.T.U. counter. Thus the counter records in a cumulative fashion the amount of heat leaving the circulating system.* During the meter operation, an observer may also read the temperature difference in the supply and return lines at the instant of observation and the number of gallons of water which has flowed through the meter since the last observation. It appears that gallon flow and temperature difference observations are intended only as checks on meter operation. The primary function of the meter is to measure heat loss or gain in the water circulating system. [Emphasis added.]

Thus, even leaving aside the fact that plaintiff has failed to show that an integrator cannot be used as part of a meter, the foregoing language in *Hewett* is so explicit and pertinent to our case as to establish affirmatively that the integrator can actually be so used.

Additionally, plaintiff argues that even assuming the integrators are "meters," they also are instruments for measuring electrical quantities, the operation of which depends on an electrical phenomenon which varies according to the factor to be ascertained. This being the case, plaintiff states that the integrators come within the ambit of subpart D, headnote 2, which covers instruments or apparatus for measuring or checking electrical quantities, the operation of which depends on an electrical phenomenon which varies according to the factor to be ascertained or automatically controlled. Since under general headnote 10(c)(ii) of the tariff schedules comparisons must be made between coordinate headings, plaintiff says that here the comparison must be made between the heading for electrical measuring instruments, the operation of which depends on an electrical phenomenon which varies according to the factor to be ascertained (subpart D, headnote 2), and the heading for meters which precedes item 713.15. It then argues that the heading for electrical measuring instruments, the operation of

which depends on an electrical phenomenon which varies according to the factor to be measured, is less easily satisfied than the provision for meters and hence is more specific. Therefore, says plaintiff, since the integrators are not optical instruments nor any of the other articles named in items 712.05 through 712.27, they are necessarily classifiable under item 712.50 as "Other" electrical measuring instruments or apparatus.

There is a basic difficulty, however, with the essential premise of plaintiff's argument. The difficulty is that classification of the integrators under item 712.50, as claimed by plaintiff, is specifically excluded by the following language of subpart D, headnote 2:

> 2. For the purposes of this subpart, the provisions herein (items 712.00 to 712.99, inclusive) for "electrical measuring, checking, analyzing, or automatically-controlling instruments and apparatus" apply *only* to the following articles:
> (a) appliances, instruments, apparatus, or machines of kinds *described in subpart C of this part or in the provisions of this subpart (subpart D) covered by items 711.00 to 711.99, inclusive* (except magnetic speedometers), the operation of which depends on an electrical phenomenon which varies according to the factor to be ascertained or automatically controlled; [Emphasis added.]
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;

In sum, while the operation of the integrator depends on an electrical phenomenon which varies according to the factor to be ascertained, the integrator is obviously not described in either subpart C or in items 711.00 to 711.99 of subpart D, and accordingly is precluded by the specific language of the headnote from being classified under item 712.50.

The protest is overruled. Judgment will issue accordingly.